***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence reverses the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties in their Pre-trial Agreement, and at the hearing as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between the named employee and *Page 2 
named employer.
3. The carrier liable on the risk is correctly named above.
4. The employee's average weekly wage is $489.42 with a resulting compensation rate of $326.29.
5. The following exhibits were stipulated into evidence:
 A) Pre-Trial Agreement;
 B) Medical Records and other documents, paginated 1-361 (Stipulated Exhibits 1-15);
 C) Deposition of Alex S. Arab;
 D) Depositions of plaintiff's treating physicians;
 *********** ISSUES
The following are the issues in contention:
1. Did the plaintiff develop carpel tunnel syndrome from her employment with the defendants?
2. Are the plaintiff's alleged mental issues related to her employment with the defendant or her alleged carpel tunnel syndrome?
3. If so, what benefits is she entitled to under the North Carolina Workers' Compensation Act?
 ***********
Based upon all of the competent evidence from the record, the Full Commission makes the following:
 FINDINGS OF FACT *Page 3 
1. At the time of the hearing before the Deputy Commissioner, plaintiff was forty-eight years old, had obtained her GED and taken some college courses and was still employed with defendant-employer.
2. Plaintiff began working for defendant-employer in 1994. She worked on an assembly line making power tools. She was required to use an air screwdriver to put together components as described in a blueprint. The screwdriver required her to exert force to ensure that the screw was properly set. The screwdriver also had a vibration. The production rate was 1000 pieces (edgers) per day in 1994.
3. In 1997, plaintiff moved over to backup utility operator and performed this job about a year and half until she became a utility operator. As a backup utility operator she had to read blueprints, troubleshoot faulty equipment, make repairs and run the console to ensure that the repaired units passed inspection. The job required the use of vibrating tools. Plaintiff worked on several different lines, the polisher, the cut saw and the impact. Plaintiff would fill in for operators that were off work.
4. On the polisher line the plaintiff would be responsible for troubleshooting equipment that did not make it through inspection, make the repairs and reassemble the piece in accordance with the blueprints. Plaintiff was required to use four different screwdrivers with torque in order to do these procedures. A button had to be pushed in order for the screwdrivers to operate. She had to use her fingers and hands to remove the screws, place the screws and move and hold the piece of equipment while working on it. In the cut saw position plaintiff had to troubleshoot to make sure the saws were running properly. Troubleshooting involved pulling the "trigger" to turn the saw on and off to test the saw in different running positions to try to detect the problem. The saws vibrated when running. The impact wrench involved similar *Page 4 
testing procedures but on different equipment. All of the tools for which she did troubleshooting as a utility operator were power tools. Plaintiff was also required to lift boxes and trays of equipment that were sometimes heavy. The main difference between being a utility operator and a backup utility operator was the difference in pay. Plaintiff's job duties in both positions were basically the same.
5. Plaintiff began to experience pain and swelling in both of her hands in 2002. She went to the Nurses Station and reported her condition to Tony Barrett and also to a person whose name was Mary. Plaintiff believed that Mary was the registered nurse at defendant-employer's business site.
6. On June 14, 2002, plaintiff presented to her family physician, Dr. Carolyn Sampson, and complained of weakness in the hands. Dr. Sampson diagnosed bilateral carpal tunnel syndrome based on plaintiff's reported symptoms.
7. On July 2, 2002, Dr. Carolyn McDonald conducted electrodiagnostic tests of plaintiff's upper extremities, which were interpreted as showing mild left carpal tunnel syndrome, arthritis in both wrists and numbness involving the bilateral upper and lower extremities.
8. Plaintiff continued to perform her regular job duties for defendant-employer. She was not restricted in the performance of her job by any physician.
9. Additional nerve conduction studies were obtained on April 28, 2003 and May 20, 2003. These diagnostic studies were interpreted as normal.
10. Plaintiff filed a workers' compensation claim for bilateral carpal tunnel syndrome on May 20, 2003.
11. Plaintiff subsequently sought treatment with Dr. Louis Clark, an orthopaedic *Page 5 
surgeon. Dr. Clark was unable to diagnose the etiology of plaintiff's complaints of numbness and tingling in her fingers. Dr. Clark referred the plaintiff for repeat nerve conduction studies on August 25, 2003 and September 23, 2003.
12. Dr. Lucas Van Tran performed the August 25, 2003 nerve conduction study and indicated that he found "no evidence of any neuropathies in the left hand to include the common carpal tunnel syndrome or less encountered radial or ulnar neuropathies" and "only subtle abnormal findings for the right median digital neuropathy at the thumb, mostly from the effect of adjacent synovial cyst formation." Dr. Van Tran further opined that, from a neurological standpoint, the plaintiff's condition would not warrant work restriction and the "patient's disability, if present, has to be based on other factors."
13. Dr. David Kishbaugh performed the September 23, 2003 nerve conduction study and he concluded that plaintiff had "normal electrodiagnostic studies with no evidence of acute or chronic radiculopathy, no evidence of diffuse peripheral neuropathy, no evidence of entrapment neuropathy" and an "isolated finding of decreased amplitude in proximal right median motor nerve conduction study of unclear significance."
14. After reviewing the normal nerve conduction studies from Dr. Van Tran and Dr. Kishbaugh, Dr. Clark concluded on September 30, 2003 that he had no solution for plaintiff from a "hand surgical standpoint." Dr. Clark did not believe plaintiff had carpal tunnel syndrome in either upper extremity and he was unable to formulate any diagnosis to explain her complaints.
15. Plaintiff treated with Dr. Paul O. Shricker on three occasions in July through August of 2003 for evaluation and treatment of bilateral hand pain, soreness and weakness. On each occasion plaintiff exhibited extreme inconsistencies during physical therapy. Due to the lack of substantial findings Dr. Shricker did not recommend any surgical intervention. He noted *Page 6 
that be could find nothing wrong with plaintiff other than possible ganglion cysts to explain her reported severe problems.
16. Dr. Shricker released plaintiff to return to work, full-duty with no restrictions as of August 7, 2003.
17. Defendant filed a Form 61, Denial of Workers' Compensation Claim, on September 8, 2003.
18. Plaintiff last worked for defendant-employer in September of 2003. At the time of her separation from employment, plaintiff was under no work restrictions from any physician.
19. On March 24, 2004 plaintiff presented to Dr. Terry M. Messer, UNC Health Care Orthopaedic Hand Clinic, with complaints of bilateral hand and wrist pain and swelling.
20. Although Dr. Messer was of the opinion that plaintiff did not exhibit classic carpal tunnel syndrome symptoms, he proceeded with a right carpal tunnel release on April 28, 2004.
21. Despite his knowledge that plaintiff's right hand complaints did not improve following surgery, Dr. Messer performed a left carpal tunnel release on July 28, 2004.
22. On September 15, 2004, plaintiff was released by Dr. Messer to work regular duty with her right hand and light duty with her left hand for six weeks. In November 2004, plaintiff was to be released to work regular duty with both hands.
23. The bilateral carpal tunnel releases were not successful in relieving plaintiff's complaints of hand pain and numbness. Plaintiff testified that she continues to experience constant pain, swelling and weakness in her hands.
24. Based on the four most recent nerve conduction studies which were all interpreted as normal and the opinions proffered by plaintiff's treating physicians, the Full Commission *Page 7 
finds that plaintiff has not proven by the greater weight of the evidence that she suffers from bilateral carpal tunnel syndrome. Dr. Clark testified that he had no diagnosis for her condition upon his release of plaintiff on September 30, 2003. Dr. Shricker's notes reveal his inability to account for plaintiff's complaints and his final note of August 7, 2003 indicates that he was not of the opinion that plaintiff suffered from bilateral carpal tunnel syndrome.
25. Although he performed bilateral carpal tunnel releases on plaintiff, Dr. Messer, testified that he only performed the procedures since nothing else had relieved plaintiff's symptoms. Dr. Messer admitted that the procedures provided little to no relief and that "it's almost certain there's something else going on other than or in addition to" bilateral carpal tunnel syndrome.
26. Dr. Messer testified that it is certainly possible that instead of bilateral carpal tunnel syndrome, plaintiff suffers from thoracic outlet syndrome based on neurodiagnostic testing and plaintiff's complaints. He was of the opinion that thoracic outlet compression would not be caused by plaintiff's employment and is commonly associated with pre-existing conditions such as "a cervical rib," hypertrophied muscles, poor posture or anything that effectively narrows the area above the clavicle.
27. Dr. Messer was unable to decide whether it was more likely than not that plaintiff suffered from carpal tunnel syndrome or thoracic outlet syndrome
28. Another of plaintiff's treating physicians, Dr. Carolyn Sampson, was of the opinion that plaintiff's symptoms were not relieved by Dr. Messer's surgery, and that in her medical opinion, she would have expected the carpal tunnel release procedures to provide relief to plaintiff if she suffered from carpal tunnel syndrome. Dr. Sampson also testified that she would ultimately rely on the opinions of orthopedic surgeons, Dr. Clark and Dr. Shricker, to *Page 8 
diagnose plaintiff's condition and determine its cause.
29. Based upon the greater weight of the evidence, plaintiff has failed to prove that she suffers from bilateral carpal tunnel syndrome and she has offered no other medical evidence to account for her alleged physical complaints.
30. With respect to plaintiff's contention that she contracted bilateral carpal tunnel syndrome due to her work duties, the Full Commission finds that plaintiff has failed to prove the necessary elements of a compensable occupational disease.
31. Plaintiff has failed to prove that her employment placed her at an increased risk for the development of carpal tunnel syndrome.
32. An ergonomic job analysis was prepared by Alex Arab. Mr. Arab testified that he is an ergonomic specialist and was tendered as an expert in the field of ergonomics. Both plaintiff and her supervisor, Dexter Thompkins, testified that the description of plaintiff's job duties was an accurate representation of plaintiff's job duties.
33. Upon reviewing the ergonomic evaluation of plaintiff's job at her deposition, Dr. Sampson testified that she did not see any of the factors that would typically put an employee at risk for carpal tunnel syndrome.
34. Plaintiff failed to prove that her employment with defendant-employer caused or significantly contributed to the development of her bilateral carpal tunnel syndrome.
35. Dr. Sampson testified that she could not determine if plaintiff's job caused her carpal tunnel syndrome. Dr. Sampson further testified that based on the ergonomic analysis, plaintiff's job would not have significantly contributed to carpal tunnel syndrome because; "there was not really any repetitive motion, just occasional" and that plaintiff should be able to perform her job. *Page 9 
36. Dr. Clark testified that since he could not diagnose plaintiff's condition there was "no way" that he could relate her condition to her employment with defendant-employer.
37. Dr. Messer testified that he could not opine that plaintiff's job caused her carpal tunnel syndrome because "we don't understand exactly what causes [it]" in the majority of cases and that any cause would most likely be multifactorial. When asked whether plaintiff's job aggravated her carpal tunnel syndrome, Dr. Messer's response was that it "could have."
38. The evidence produced by defendants tends to show that plaintiff's problems may not be due to physical causes. Plaintiff suffers from somatization disorder, a psychological term used to describe situations where individuals express their psychological difficulties in terms of physical symptoms.
39. Dr. Thomas Gualtieri, a neuropsychiatrist, has evaluated the plaintiff on two occasions, the first in 1997 and the second in 2005. Dr. Gualtieri performed a battery of tests designed to identify disorders and distinguish factitious disorders.
40. Dr. Gaultieri testified that plaintiff's results on the Personality Assessment Inventory indicated diagnostic considerations that included "very serious medical conditions" including schizophrenia as well as somatization disorder. Dr. Gaultieri believed that plaintiff's problems were psychiatric in nature and that they were not related to her injury in 1997 and not related to carpal tunnel syndrome. The Full Commission gives great weight to the opinions of Dr. Gaultieri.
41. Plaintiff began to receive psychiatric treatment from Dr. Antonio Cusi, a psychiatrist, in 2003. Dr. Cusi testified that the psychological diagnostic testing conducted on plaintiff indicated that "there is a component" or some profile that pointed to the possibility of a somatization disorder. Dr. Cusi testified that with plaintiff's psychological profile it is possible *Page 10 
that she could have perceived a carpal tunnel injury without it truly existing. Dr. Cusi also testified that plaintiff experienced episodes where her "reality testing was compromised," and that, with regard to exaggeration of symptoms, "I can see that in her."
42. Both Dr. Cusi and Dr. Gualtieri were of the opinion that plaintiff's troubled personal life was a contributing factor in the development of her current psychological status.
43. Since plaintiff has not established that she suffers from a compensable occupational disease, her claim of psychological impairment allegedly related to bilateral carpal tunnel syndrome or chronic pain would not be compensable.
44. The Full Commission gives less weight to the opinions rendered by Dr. Anthony Mangiardi, plaintiff's treating psychologist, considering all of the more persuasive evidence presented.
45. The Full Commission finds that plaintiff has failed to prove by the greater weight of the evidence that she has sustained a compensable occupational disease.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff has failed to meet her burden of proving the existence of a compensable occupational disease. N.C. Gen. Stat. § 97-53(13);Hansel v. Sherman Textiles, 304 N.C. 44, 283 S.E.2d 101 (1981).
2. Plaintiff has failed to prove that her psychological condition is causally related to a compensable occupational disease or injury by accident. Where the exact nature and probable genesis of a particular type of injury involves complicated medical questions far from the *Page 11 
ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury. Click v.Freight Carriers, 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980). In the present case the greater weight of the medical evidence does not support a causal relationship between plaintiff's psychological condition and the conditions relating to her employment. N.C. Gen. Stat. §§ 97-2(6),97-53(13).
 ***********
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for workers' compensation benefits is hereby DENIED.
2. Each side shall bear its own costs.
This the __ day of April 2008.
S/______________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/______________________ DANNY L. McDONALD COMMISSIONER
 S/______________________ BUCK LATTIMORE COMMISSIONER *Page 1